REENA RAGGI, Circuit Judge,
concurring:
I join the court in reversing the judgment in favor of the Firms on their state law claims of “hot news” misappropriation on the ground that such claims are preempted by federal copyright law. See 17 U.S.C. § 301. Unlike my colleagues in the majority, I do not reject the five-part test enunciated in National Basketball Association v. Motorola, Inc., 105 F.3d 841 (2d Cir.1997) (“NBA”), to reach this result. Whatever reservations I may have about that test as a means for identifying non-preempted “hot news” claims, I do not think it can be dismissed as dictum. Accordingly, I write separately to explain why I conclude that the Firms failed to satisfy the “direct competition” requirement of NBA’s test.
1. The Firms’ Claims Satisfy the Subject Matter Requirement for Federal Copyright Preemption
At the outset, I note my agreement with the majority’s conclusion that the Firms’ claims satisfy the subject matter requirement for copyright preemption of state law. See ante at 891-93, 901-03. The written research reports containing the Recommendations are certainly “within the type of works protected by” §§ 102 and 103 of the Copyright Act. Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir.2004); see also 17 U.S.C. § 301(a), (b)(1). Moreover, although the Recommendations are uncopyrightable opinions, see 17 U.S.C. § 102(b); Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 978 (2d Cir.1980) (noting that copyright does not protect ideas or interpretations of facts), § 301 preempts claims regarding the “uncopyrightable as well as copyrightable elements” within the protected reports, NBA, 105 F.3d at 849-50. Thus, while the Firms can invoke copyright law to prevent Fly from copying the original expression of their ideas, and indeed have successfully done so in this case, they cannot avoid preemption by seeking state law protection only for the non-copyrightable Recommendations.
This conclusion obtains from Congress’s considered choices (1) to withhold copyright protection for ideas but, nevertheless, (2) to preempt that which falls within the subject matter of copyright rather than only what is protected by copyright. See 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 19D.03 [A][2][b], at 19D-28 (2010) (noting Congress’s “policy decision” not to protect ideas with copyright); 5 William F. Patry, Patry on Copyright §§ 18:14-18:15, at 18-49 to 18-53 *908 (2011) (noting that § 301 refers to subject matter of copyright referenced in § 102, which section describes what is and is not copyrightable, rather than only works protected by copyright). The fact that the Recommendations are valuable in part because they are authored by the Firms, which have made a “substantial investment” in building reputations for producing high quality research, Barclays Capital Inc. v. Theflyonthewall.com, 700 F.Supp.2d 310, 319 (S.D.N.Y.2010), does not change the result. Even if Fly’s distribution of Recommendations might be viewed as a misappropriation of the Firms’ goodwill, such claims are preempted for the reasons discussed infra at 908-11. See 5 Patry, supra, § 18:39, at 18-129 (noting that claims for misappropriation of goodwill are preempted); see also Marmllo v. Gruner + Jahr AG & Co., No. 98Civ5000, 2001 WL 40772, at *7 (S.D.N.Y. Jan. 17, 2001) (dismissing claim of misappropriation “designed to trade” on “popularity and goodwill” as preempted (internal quotation marks omitted)).
To be sure, legal theories other than copyright might protect the Firms’ trademarks or prevent confusion regarding the Recommendations’ origins. See, e.g., 15 U.S.C. § 1114(1) (imposing liability for use or imitation of registered marks “likely to cause confusion,” mistake, or deception); id. § 1125(a)(1)(A) (imposing liability for use of “any false designation of origin,” or misleading representations “likely to cause confusion ... as to the origin, sponsorship, or approval” of goods). But the Firms do not allege that Fly passed off its own financial advice as that of the Firms or misrepresented that the Recommendations originated with Fly. Cf. Warner Bros. Inc. v. Am. Broad. Cos., 720 F.2d 231, 247 (2d Cir.1983) (noting non-preemption of unfair competition claims based on “passing off’). To the extent the Firms seek to protect their Recommendations from dissemination, a subject preempted but not protected by federal copyright law, they must seek relief from Congress rather than the courts.
2. The Firms’ Claims Satisfy the General Scope Requirement for Preemption Under NBA
I also agree with the majority’s determination that the Firms’ claims satisfy § 301’s general scope requirement because the Firms seek to vindicate rights “that may be abridged by an act which, in and of itself, would infringe one of the exclusive rights provided by federal copyright law.” Computer Assocs. Int’l, Inc. v. Altai, Inc., 982 F.2d 693, 716 (2d Cir.1992) (internal quotation marks omitted); see ante at 892-93, 902-03. In reaching this conclusion, the majority dismisses the five-part test enunciated in NBA as dictum and identifies other factors distinguishing this ease from International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918) (“INS”). See ante at 898-906. Although I too have'reservations about NBA’s test — specifically, whether it in fact identifies “extra elements” qualitatively different from those rights protected exclusively by copyright to avoid preemption — I am not convinced that the standard can be dismissed as dictum. In any event, we need not do so in this case because the Firms failed to satisfy the direct competition requirement of NBA’s test.
a. NBA’s Test May Not Identify Elements Qualitatively Different from Exclusive Rights Protected by Copyright
Having disclosed reservations as to NBA’s test, I briefly explain them.
States originally exercised concurrent power over copyright as long as their laws *909 did not conflict with federal statutory protections. See Goldstein v. California, 412 U.S. 546, 560-61, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973); Roth v. Pritikin, 710 F.2d 934, 938 (2d Cir.1983) (noting “dual system” in which federal law regulated published works while state common law protected unpublished material). The Copyright Act of 1976 ended this “unwieldy” arrangement by implementing a “uniform system of copyright protection,” Roth v. Pritikin, 710 F.2d at 938, and expressly preempting certain state laws respecting “legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106,” 17 U.S.C. § 301(a); see Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d at 305.
To identify rights “equivalent” to those protected by copyright, courts apply an “extra elements” test that saves from federal preemption claims requiring elements “instead of or in addition to the acts of reproduction, performance, distribution or display.” Computer Assocs. Int’l, Inc. v. Altai Inc., 982 F.2d at 716 (internal quotation marks omitted); see 1 Nimmer, supra, § 1.01[B][1], at 1-12 to 1-14. This test is satisfied, however, only if extra elements change “the nature of the action so that it is qualitatively different from a copyright infringement claim.” Computer Assocs. Int’l, Inc. v. Altai Inc., 982 F.2d at 716 (internal quotation marks omitted; emphasis in original). Put another way, elements that limit “the scope of the claim but leave[] its fundamental nature unaltered” do not prevent preemption. Briar-patch Ltd. v. Phoenix Pictures, Inc., 373 F.3d at 306-07; see Mayer v. Josiah Wedgwood & Sons, Ltd., 601 F.Supp. 1523, 1535 (S.D.N.Y.1985) (stating that elements altering “action’s scope but not its nature” are insufficient to avoid preemption). For example, claims based on breaches of fiduciary duty, contractual promises of confidentiality, or trade secrets often survive preemption because “the underlying right they seek to vindicate is the right to redress violations of’ a particular duty or promise different from an exclusive right protected by copyright. Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d at 307; see also Kregos v. Associated Press, 3 F.3d 656, 666 (2d Cir.1993); 1 Nimmer, supra, § 1.01[B][l][a][i], at 1-15 to 1-16 (stating that claims for breaches of contractual confidentiality provisions are not preempted).[1] In contrast, unfair competition, misappropriation, or unjust enrichment claims are. preempted when based on alleged acts such as distribution or reproduction, despite required elements of intent, enrichment, or commercial immorality. See, e.g., Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d at 306-07 (concluding that “enrichment element,” like intent or awareness, limited claim’s scope but left its “fundamental nature unaltered”); Financial Info., Inc. v. Moody’s Investors Sent., Inc., 808 F.2d 204, 208 (2d Cir.1986) (concluding unfair competition claim preempted de *910 spite requirement of “commercial immorality” (internal quotation marks omitted)).[2]
In NBA, this court applied the “extra element” test to determine “the extent to which a ‘hot news’ misappropriation claim,” originally identified by the Supreme Court in INS prior to the Copyright Act of 1976, avoided § 301 preemption. See 105 F.3d at 850-51. In concluding that “some form” of “hot news” claim was not preempted, NBA relied first on a House Report to the 1976 Act stating that “ ‘state law should have the flexibility to afford a remedy ... against a consistent pattern of unauthorized appropriation by a competitor of the facts (i.e., not the literary expression) constituting ‘hot’ news, whether in the traditional mold’” of INS “‘or in the newer form of data updates from scientific, business, or financial data bases.’” Id. at 850 (quoting H.R.Rep. No. 94-1476, at 132, 1976 U.S.C.C.A.N. 5659, 5748 (1976)); see id. (citing Financial Info., Inc. v. Moody’s Investors Serv., Inc., 808 F.2d at 209 (relying on House Report in noting that “hot news” claims not preempted)).
Although this legislative history is some evidence that Congress did not intend federal copyright law to preempt all “hot news” claims, the scope of that intent is not easily discerned. The House Report references an earlier version of the 1976 Act containing examples of non-preempted actions, including “rights against misappropriation not equivalent to” the exclusive § 106 rights, “breaches of contract, breaches of trust ... and deceptive trade practices such as passing off and false representation.” H.R.Rep. No. 94-1476, at 24, 1976 U.S.C.C.A.N. 5659, 5748; see also 5 Patry, supra, § 18:8, at 18-21 to 18-27. After the Justice Department raised concerns about the identification of misappropriation as a non-preempted action, Congress chose to omit the entire list from the final bill. See 5 Patry, supra, § 18:8, at 18-27 to 18-31 (discussing confusing colloquy between House Judiciary Committee members regarding deletion of list). Thus, it is not clear what weight the Report excerpt quoted in NBA can bear in any assessment of whether a particular “hot news” claim survives federal copyright preemption. See generally Architectronics, Inc. v. Control Sys., Inc., 935 F.Supp. 425, 440-41 (S.D.N.Y.1996) (declining to rely on § 301’s “puzzling and unreliable” legislative history); cf. B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1203-05 (2d Cir.1992) (declining, in context *911 of analyzing Comprehensive Environmental Response, Compensation, and Liability Act, to rely on legislative history “revealing] a picture more confusing than pellucid”).
NBA next identified five factors central to a non-preempted “INS-like” claim: (1) the plaintiff incurred costs to generate or gather information (2) that is time-sensitive and (3) used by the defendant in a manner constituting free-riding (4) in direct competition with plaintiffs product when (5) the ability of parties to free-ride so reduces the incentive to produce the product that its existence or quality is' substantially threatened. 105 F.3d at 852.[3] I share the concern expressed by some courts and commentators as to whether these “extra elements” qualitatively differentiate a “hot news” tort from a claim of unauthorized copying or distribution, activities violating rights equivalent to those within the general scope of § 106. See 5 Patry, supra, § 18:40, at 18-139 to 18-141 (questioning whether NBA’s factors are sufficient to avoid preemption). “Free riding” in this context appears synonymous with proscribed copying. See id. § 18:40, at 18-140 (“[C]opying information someone else generated ... can always be characterized as free riding....”); Lowry’s Reports, Inc. v. Legg Mason, Inc., 271 F.Supp.2d 737, 756 (D.Md.2003) (noting that free riding “may be a pejorative description of copying, but it is still copying” (internal quotation marks omitted)). Although the other four NBA factors may narrow the tort’s scope to egregious instances of “free riding” factually similar to INS, they do not appear to alter the nature of the claim. See Lowry’s Reports, Inc. v. Legg Mason, Inc., 271 F.Supp.2d at 756 (noting that “cost,” “time sensitivity,” and “direct competition ... merely define pre-existing conditions” while “threat” to plaintiffs business “merely identifies a consequence of’ free riding). Accordingly, I share some of the majority’s doubt regarding the viability of NBA’s test, but for a different reason. I question whether the test adequately identifies tort claims with “extra elements” qualitatively different from the rights protected by copyright.
b. NBA’s Test Is Not Dictum
Despite my reservations regarding NBA’s test, I think it controls our resolution of this appeal. My colleagues in the majority are of a different view. They conclude that NBA “held” only that the facts presented could not establish a non-preempted “hot news” claim. Ante at 899 & n. 32. They dismiss NBA’s five-part test as an unnecessary discussion of hypothetical circumstances giving rise to a “hot news” claim, which, as dictum, we need not follow. See ante at 898-900 & n. 32. I am not convinced.
In holding that the NBA plaintiff failed to assert a non-preempted “hot news” claim, the court was required to determine the “breadth of the ‘hot news’ claim that survives preemption.” See NBA 105 F.3d at 850 (emphasis in original). To answer that “crucial question,” id., the court identified five factors required to state a non-preempted “hot news” claim, applied them to the facts presented, and concluded that plaintiffs claim failed, id. at 845, 852-54. Because the test was thus necessary to the opinion’s result, it is not dictum. See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 66-67, 116 S.Ct. 1114, 134 L.Ed.2d 252 *912 (1996) (noting Supreme Court bound “not only [to] the result” of prior opinions but also to portions “necessary” to that result); Baraket v. Holder, 632 F.3d 56, 59 (2d Cir.2011) (“[I]t is not substantive discussion of a question or lack thereof that distinguishes holding from dictum, but rather whether resolution of the question is necessary for the decision of the case.”); Hormel Foods Corp. v. Jim Henson Prods., Inc., 73 F.3d 497, 508 (2d Cir.1996) (stating that dictum refers to observations that “could have been deleted without seriously impairing the analytical foundations of the holding” (internal quotation marks omitted)).
The majority doubts whether the five-part test could be part of NBA’s “holding” because the opinion twice describes that test and once identifies three, rather than five, needed “extra elements,” namely, (1) the time-sensitive value of the information; (2) free-riding; and (3) the threat to the existence of plaintiffs product. See ante at 899-901 (citing NBA 105 F.3d at 845, 852-53). In fact, the two iterations of the five-part test are almost identical despite one version’s citation to stronger language from INS requiring the competition to “cut off the service by rendering the cost prohibitive.” NBA 105 F.3d at 842, 852-53 (internal quotation marks omitted). Moreover, in its three-element formulation, NBA emphasized the need for a “hot news” plaintiff to show “free riding ... enabling the defendant to produce a directly competitive product for less money because it has lower costs.” Id. at 854 (emphasis added). Direct competition is thus essential to a non-preempted claim, whether such competition is identified as a distinct element of a five-part test or as part of the free-riding component of a three-part test. Cf. United States v. Quinones, 511 F.3d 289, 315-16 (2d Cir.2007) (identifying no error in charge that defined racketeering by reference to three elements rather than traditional five where “three-element formulation” included “all the factual findings necessary to support” conviction). Similarly, the gathering of information at a cost appears to be a prerequisite under both iterations of the NBA test because the three-part formulation requires time-sensitive information. Any remaining differences may afford flexibility for future panels to explain particular elements but they do not permit wholesale abandonment of the test as dictum.
Even if the test were dictum, such a strong statement of standards deserves “close consideration” and respect. Jimenez v. Walker, 458 F.3d 130, 142 (2d Cir. 2006); see also United States v. Garcia, 413 F.3d 201, 232 n. 2 (2d Cir.2005) (Calabresi, J., concurring) (“Emphatic dicta will and should be afforded more weight by later panels than casual dicta.”). This is especially true here because the parties and district court all appear to have viewed the test as controlling at trial. See Barclays Capital Inc. v. Theflyonthewall.com, 700 F.Supp.2d at 335. Further, even if NBA’s two iterations of the “extra element” test are confusing, no clearer understanding of the scope of non-preempted “hot news” misappropriation claims is achieved simply by identifying other factual differences between the instant case and INS. See ante at 901-06.
Thus, I would apply the NBA test to this case and reverse on the ground that the Firms failed to satisfy its direct competition requirement for a non-preempted claim.
c. The Firms Failed To Establish Direct Competition Between Their Recommendations and Fly’s Substantially Different Aggregate Product
In concluding that the Firms failed to establish a non-preempted “hot news” *913 claim under the test identified in NBA, I rely on facts emphasized by the majority, namely, that Fly produces an aggregate product reporting many Firms’ Recommendations among other financial news, and attributing each Recommendation to its source, while the Firms each disseminate only their own Recommendations to clients who engage in a particular level of trading with the Firms. See ante at 901— 06. The majority, however, uses these facts to draw a bright line distinguishing between the Firms, who generate news, and Fly and other news aggregators, who “break” the news, with the former falling outside of hot-news protection. See ante at 902. I am not convinced that this distinction is determinative here because the Firms appear to play both roles. Not only do they generate their Recommendations, they then disseminate them, recouping the cost of generation through trading revenue. I am not prepared to foreclose the possibility of a “hot news” claim by a party who disseminates news it happens to create. I conclude simply that the facts emphasized by the majority preclude the Firms from stating a non-preempted “hot news” claim for a different reason derived from NBA: the Firms’ product and Fly’s newsfeed do not directly compete.
Although NBA turned on the plaintiffs failure to show free riding on and a sufficient threat to its services, the court there discussed the direct competition element in noting that the plaintiff had “compressefd] and confuse[d] three different informational products.” 105 F.3d at 853. Separating the NBA’s dissemination of live basketball games and copyrighted broadcasts from its collection and transmission of factual material about the games through a pager service, the court determined that only the latter might directly compete with the defendant’s product, another pager service providing facts about live games. See id. at 853-54 (noting “separate market for” pager service). In other words, only products in the “keenest” of competition satisfy the direct competition requirement for a non-preempted claim. INS, 248 U.S. at 221, 230, 39 S.Ct. 68 (stating that plaintiff and defendant newspaper companies were “in the keenest competition” in gathering and publishing news throughout United States).
In this case, I identify no clear error in the district court’s impressively thorough fact-finding. See Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir.2011) (applying clear error review to factual findings after bench trial). But reviewing legal determinations de novo, see id. at 51, I conclude that the direct competition element of NBA’s test was applied more broadly than warranted. Whatever Fly’s ultimate purpose or impact in distributing the Firms’ Recommendations, the critical consideration for purposes of identifying direct competition is the substantial similarity of the products in satisfying relevant market demand.
In concluding that direct competition was established, the district court observed that both the Firms and Fly disseminate “Recommendations to investors for their use in making investment decisions.” Barclays Capital Inc. v. Theflyonthewall.com, 700 F.Supp.2d at 339. Such a broad similarity between the companies’ overall goals does not constitute the substantial similarity required for direct competition. Even assuming that the Firms’ distribution of research reports is one of its “primary businesses,” each Firm distributes only its own Recommendations to investors most likely to follow its advice and place a trade through it. See id. at *914 316-19.[4] The Firms do not aggregate or distribute other Firms’ Recommendations. See id. at 317. To do so would interfere with the Firms’ business model, which is based on investors’ inclinations to trade with the Firm from which they received a Recommendation. See id. at 318-19. Indeed, the Firms limit full access to their research to clients who generate sufficient trading revenue. See id. at 319. By contrast, Fly does not produce any of its own recommendations or seek trading commissions. See id. at 322-24. Rather, it “collects] and publishes] financial news” to anyone interested in such information through a subscription service, the most lucrative aspect of which is the distribution of sixty-five firms’ Recommendations, with each Recommendation attributed to its source. Id. at 322-24.
It bears noting that, like the district court, I view Fly’s conduct as strong evidence of free-riding, or worse depending on how it came into possession of the Recommendations. See id. at 336-37. Although Fly expends some effort to gather and aggregate the Recommendations, Fly is usurping the substantial efforts and expenses of the Firms to make a profit without expending any time or cost to conduct research of its own. I cannot celebrate such practices, which allow Fly “to reap where it has not sown.” INS, 248 U.S. at 239, 39 S.Ct. 68. As the majority notes, however, such apparent unfairness does not control preemption analysis. See ante at 894-97. Although Fly free-rides on the Firms’ efforts, Fly’s attribution of aggregate Recommendations demonstrates the crucial difference between the businesses: while the Firms disseminate only their own Recommendations to select clients most likely to follow the advice and place trades with the Firms, Fly aggregates and disseminates sixty-five firms’ Recommendations and other financial information to anyone willing to pay for it without regard to whether clients accept or trade on particular Recommendations.
An example illustrates the distinction. Two firms might disseminate opposing Recommendations on the same stock. These two firms directly compete in attempting to convince clients to follow their Recommendation and place a trade. Fly, on the other hand, would presumably report both opinions (as well as scores of others) to its readers without regard to whether they trade on the information. Some investors may place a particular value on learning all Recommendations, and some people may have a general interest in learning such news even without wishing to invest. Thus, Fly’s product may directly compete with that of other financial news outlets, such as Dow Jones, that also seek to provide all Recommendations to anyone interested in such news. See Associated Press v. All Headline News Corp., 608 F.Supp.2d 454, 457-58, 461 (S.D.N.Y.2009) (holding that plaintiff news agency sufficiently pleaded “hot news” tort by alleging that defendant news service copied and distributed plaintiffs stories under defendant’s name). But Fly’s aggregate subscription product is sufficiently distinct from the Firms’ business model, which cannot be divorced from the trading market it targets, to preclude a finding of *915 the direct competition required by NBA’s test.[5]
The district court observed that Fly intended its newsfeed to fulfill “demand for the original work” as evidenced by its recent distribution of the newsfeed through discount brokers, thereby creating the “final stage” of direct competition by driving away commission revenue. Barclays Capital Inc. v. Theflyonthewall.com, 700 F.Supp.2d at 339-40 (internal quotation marks omitted). The discount brokers, however, are simply one of many third-party distributors that disseminate Fly’s newsfeed. See id. at 324-25. While the discount brokers separately place trades, Fly does not endorse investment advice or seek commission revenue. Moreover, as the majority points out, even the Firms’ authorized clients are free to use discount brokers once they receive a Recommendation. See ante at 904-05. Thus, although some investors may use Fly’s newsfeed instead of paying for direct receipt of the Firms’ Recommendations, the overlap in potential clients does not make the products or their targeted markets sufficiently similar to satisfy NBA’s direct competition requirement for a non-preempted claim.
3. Conclusion
I join the court in deciding to affirm in part and vacate and remand in part the judgment in favor of the Firms. As to the decision to vacate, I must respectfully decline to join in the majority opinion. I conclude that the Firms’ “hot news” misappropriation claims are preempted by federal copyright law because the Firms cannot demonstrate direct competition with Fly as required by this court’s test in NBA, 105 F.3d at 845, 852-53. Whatever reservations I may have about that test’s ability to identify extra elements for a “hot news” misappropriation claim that are qualitatively different from the rights protected by federal copyright law, I cannot join the majority in dismissing the test as dictum. Further, because I think the Firms fail to satisfy even NBA’s test, I see no need to reach the same preemption conclusion by reference to other factual differences between this case and INS, 248 U.S. 215, 39 S.Ct. 68.

. Thus, the Firms might protect their authorized clients’ valuable "informational advantage," Barclays Capital Inc. v. Theflyonthewall.com, 700 F.Supp.2d at 316, by bringing contract actions against clients or employees who disseminate Recommendations in violation of confidentiality agreements. Moreover, to the extent Fly or similar companies induce such breaches, a tortious interference of contract claim might provide redress. See 1 Nimmer, supra, § 1.01[B][l][a][ii], at 1-18 n. 96 (noting that contract interference claims based on “activity other than unauthorized reproduction, distribution, performance, etc.” avoid preemption). Such claims were notably unavailable in INS, where the value of the plaintiff's news lay in public dissemination rather than secrecy. See 248 U.S. at 235, 39 S.Ct. 68 (emphasizing that the "peculiar value of news is in the spreading of it while it is fresh”).

. Precisely because the Copyright Act preempts only state claims regarding rights equivalent to those protected by copyright, I do not share the majority's "pressing concern” regarding the potential for disparate state law "hot news” doctrines. Ante at 896-98. To be sure, § 301 prevents states from expanding or contracting federal copyright law. See NBA, 105 F.3d at 849; Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d at 716. But there is nothing alarming about states adopting differing versions of non-preempted legal theories that protect rights qualitatively different from those addressed by copyright.
I similarly identify nothing troubling with the use of state tort law or a judicial injunction to maintain the Firms’ informational advantage at the expense of other traders. See ante at 896 n. 29. Courts routinely enforce non-preempted state laws that protect one company's exclusive use of information. See, e.g., Russo v. Ballard Med. Prods., 550 F.3d 1004, 1014-16 (10th Cir.2008) (upholding jury verdict for trade secret misappropriation and breach of confidentiality agreement when claims not preempted by patent law); Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d at 717-21.
The issue presented on appeal is thus whether the Firms' claims are preempted, not the similarity of states' "hot news” doctrines or the perceived commercial morality of a company profiting from an informational advantage.

. NBA ’s test is sometimes mischaracterized as identifying the "elements” of a "hot news” tort under state law. See, e.g., Pollster v. Gigmania, Ltd., 170 F.Supp.2d 974, 979 (E.D.Cal.2000). The federal courts, however, cannot create New York common law. That task is reserved for New York courts. Rather, the NBA test attempts to define a subset of New York "hot news” claims surviving preemption.

. Noting NBA's discussion of direct competition in a "primary market,” the district court concluded that the Firms’ dissemination of Recommendations is one of their "primary businesses” "central” to the Firms' business model. Barclays Capital Inc. v. Theflyonthewall.com, 700 F.Supp.2d at 339 (internal quotation marks omitted). Considering the vast resources used to create the research reports and the use of those reports to generate trading revenue, I accept for purposes of this appeal that equity research does constitute a primary business of the Firms.

. The majority offers an apt hypothetical for how the Firms and Fly might directly compete under different circumstances. If, aside from distributing its own opinion, the Firms disseminated other Firms’ Recommendations, Fly might directly compete with such a similar aggregate product. See ante at 905-06; see also NBA, 105 F.3d at 854 (noting potential "hot news” claim if defendant "in the future were to collect facts from” plaintiff's pager system). Similarly, if Fly tracked and reported the Recommendations of only one firm, that firm might have a stronger claim of direct competition.