**Jean Claude DELVILLE, Plaintiff,**

v.

**FIRMENICH INCORPORATED, Defendant.**

No. 08 Civ. 10891(JPO).

United States District Court, S.D. New York.

Jan. 31, 2013.

Anne L. Clark, Jeremiah Joseph Iadevaia, Vladeck, Waldman, Elias & Engelhard, P.C., New York, NY, for Plaintiff.

Gregory Bertram Reilly, III, A. Michael Weber, Anna Nesterova, Littler Mendelson, P.C., New York, NY, for Defendant.

## MEMORANDUM AND ORDER

J. PAUL OETKEN, District Judge.

This action involves federal, state, and common law claims and counterclaims by and between Jean Claude Delville ("Plaintiff" or "Delville") and his former employer, Firmenich Incorporated ("Defendant," "the Company," or "Firmenich"). Delville claims that Firmenich (1) discriminated against him on the basis of his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq. ("First Claim"), the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law § 290, et seq. ("Second Claim"), and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Administrative Code § 8–107, et seq. ("Third Claim"); (2) retaliated against him in violation of ADEA ("Fourth Claim"), NYSHRL ("Fifth Claim"); and NYCHRL ("Sixth Claim"); and (3) breached its contract with him respecting Firmenich's deferred compensation plan ("the CAP plan") and Incentive Compensation Plan ("Seventh Claim"). Firmenich counters that Delville (1) breached his contract with Firmenich ("First Counterclaim"); (2) breached his fiduciary duties to Firmenich ("Second Counterclaim"); (3) breached his common law duty of loyalty to Firmenich ("Third Counterclaim"); (4) engaged in unfair competition ("Fourth Counterclaim"); and (5) misappropriated Firmenich's property ("Fifth Counterclaim").[1]

Before the Court are cross-motions for summary judgment. For the reasons that follow, Plaintiff's motion for summary judgment is granted in part and denied in part, and Defendant's motion for summary judgment is denied.

## I. Background

### A. Factual Background

The facts set forth below are taken from the parties' Rule 56.1 Statements and the record evidence cited in those Statements. (See Dkt. No. 33 ("Def.'s 56.1"), Dkt. No. 27 ("Pl.'s 56.1"), Dkt. No. 48 ("Def.'s 56.1 in Opp'n."), Dkt. No. 49 ("Pl.'s 56.1 in Opp'n.").)[2]

---

1. Firmenich's Sixth Counterclaim for unjust enrichment has been withdrawn. Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment at 2 n. 1.

2. Certain facts herein relate primarily to one

## 1. The Parties

Firmenich is part of the Firmenich Group, a prominent, international manufacturer of perfumes and flavors. (Pl.'s 56.1 at ¶ 1.) Firmenich Group has offices in New York, New Jersey, and Europe.

Delville was born March 2, 1949, making him 58 years old at the time of his departure from Firmenich. He is a lifelong perfumer—which is to say, he creates perfumes. This is no ordinary skill. Perfuming is a "combination of art, pharmacy, pharmacology and chemistry," and practitioners are handsomely rewarded for their talents. (Def.'s 56.1 at ¶¶ 10–11, 25–30.) Delville worked for Firmenich in Paris from 1984–1986, and then rejoined the company in 2000. (Id. at ¶¶ 12, 18; Pl.'s 56.1 at ¶ 8.) In between his stints at Firmenich, Delville worked for another renowned fragrance manufacturer, International Flavors & Fragrance ("IFF"), where he created "Happy," one of the highest grossing perfumes of all time. (Def.'s 56.1 at ¶ 14.)

During his second stint at Firmenich, Delville specialized in making fine fragrances. (Pl.'s 56.1 at ¶ 43.) As a fragrance perfumer, Delville reported to Jerry Vittoria ("Vittoria"). (Id. at ¶¶ 44, 48.)

When Delville rejoined Firmenich, his then-girlfriend and future wife, Mireya Zendejas ("Zendejas"), also left IFF to work at Firmenich. (Pl.'s 56.1 in Opp'n. at ¶ 123; see also Dkt. No. 29 ("Zendejas Decl.") at ¶ 3.) Zendejas remained at Firmenich until 2008, the year following the departure of her husband. (Id.) Zendejas is eighteen years Delville's junior.

## 2. The Parties' Agreements

On April 1, 2000, the parties entered into an employment agreement ("the Employment Agreement" or "the Agreement"). (Dkt. No. 30 ("Clark Decl."), Ex. 10 ("Emply.Agrmt.").) The Employment Agreement provides for Delville's employment with Firmenich from April 1, 2000 to March 31, 2003. (Id. at 1.) It also states that, unless Firmenich gave Delville notice of its intention not to renew to the Employment Agreement by March 31, 2003, it would be automatically renewed for another year. (Id.) The Employment Agreement only allows Firmenich to terminate Delville for "Cause," "Death," or "Disability." (Id. at 3–5.)

Under the Employment Agreement, Delville was to receive a base salary of $425,000; a yearly contribution in the CAP plan of $50,000; and the opportunity to earn up to an addition $150,000 annually under the Incentive Compensation Plan. (Id. at 2–3.)

The Employment Agreement also contains the following language ("the Merger Clause"): "This Agreement contains the entire agreement between [the parties] with respect to the transaction contemplated herein and supersedes all previous" agreements. (Id. at 9–10.) Further, the Employment Agreement states that its "terms shall not be altered or otherwise amended except pursuant to an instrument in writing signed by each of the parties hereto and making specific reference to this agreement." (Id. at 10.)

In May 2004, the parties executed an amended employment agreement ("the Amended Employment Agreement"), al-

---

party's Motion for Partial Summary Judgment. For instance, the facts concerning the renegotiation of Delville's contract, the treatment of Delville as a result of his age, and any retaliation that took place are relevant to Defendant's Motion, while the facts concerning

the missing formulas are particularly relevant to Plaintiff's Motion. In these sections, to the extent that the facts are disputed, this Court has construed the facts in the light most favorable to the non-moving party.

tering several terms of the original Employment Agreement. (Clark Decl. Ex 14 ("Amend. Emply. Agrmt.").) The other written agreement relevant to this case is the "Employee's Secrecy Agreement" ("the Secrecy Agreement"), executed on April 5, 2000. (Clark Decl. Ex. 11 ("Sec. Agrmt.").)

### a. The CAP Plan

There are in fact two CAP plans relevant to this litigation: the CAP I plan, amended as of July 1, 2002, and the CAP II plan, dated January 1, 2005. (Dkt. No. 35 ("Murad Decl."), Exs. D ("CAP I") and E ("CAP II").) CAP I provides that "[a] Participant shall have a 100% nonforfeitable interest in the Participant's Employee Deferral Contributions and Supplemental Employer Contributions which are credited under the Plan, unless the Committee establishes a vesting schedule for any Supplemental Employer Contributions ...." (CAP I at 11.) CAP I has a penalty provision, which states that

> [i]f a Participant terminates employment with Firmenich for any reason ... and begins to work for any competitor prior to or subsequent to the payment of all distributions, as determined within Firmenich's complete discretion, the value of any Account ... shall be **"frozen"** as of the occurrence of such an event, and all payments shall be delayed or suspended.

(*Id.* (emphasis in original).)

Under CAP II's penalty provision, an employee's account is not frozen if he leaves for a competitor; pursuant to CAP II, the employer contributions to the CAP plan are forfeited, but not the employee contributions. (CAP II at 22.) The entirety of Plaintiff's CAP II account consisted of contributions made by Plaintiff.

(Clark Decl., Ex. 71; Dkt. No. 41 ("Delville Decl. in Opp'n.") at ¶ 11.) Pursuant to CAP II, distributions were to be made at the employee's departure. (CAP II at 17.)

Under the Employment Agreement, Firmenich was to "make an initial, fully vested contribution equal to $50,000 to a bookkeeping account on [Delville's] behalf" to the CAP Plan. Thereafter, Firmenich was to "make subsequent annual, fully vested contributions of $50,000 per year ... within 30 days after the end of each complete year of employment as long as [Delville] remains an active employee of [Firmenich]." (Emply. Agrmt. at 3.) The parties' Amended Employment Agreement, executed in May 2004, increased Firmenich's contributions to Delville's CAP account "from $50,000 to $60,000." (Amend. Emply. Agrmt.) Firmenich contends that the parties' agreement as to the CAP plan was thereafter altered again, and that the parties agreed to reduce Firmenich's contributions back down to $50,000 per annum for 2005 and 2006. In any event, for 2005 and 2006, Firmenich contributed $50,000 into Delville's account under the CAP plan. (Clark Decl., Ex. 19.)

### b. Incentive Compensation Plan

Pursuant to the Employment Agreement, Delville was a "participa[nt] in the Firmenich Perfumers Incentive Compensation Plan." (Emply. Agrmt. at 2.). The Incentive Compensation Plan, as outlined in Delville's Employment Agreement, provides that

> The Employees shall be entitled to earn an Incentive Compensation Award of up to **$150,000** per year. In order to achieve the maximum incentive award, the Employee must create fragrances which, in the aggregate, have adoption values[3] in excess of **$5,000,000** per

---

**3.** An "adoption" refers to a client's selection of a perfumer's creation for manufacturing, marketing, and sale. (*See* Def.'s 56.1 at ¶ 21.)

year. A minimum bonus of $100,000 per year shall be guaranteed for the first two years of employment.... Thereafter, bonus shall be paid in accordance with the terms of the Incentive Compensation Plan (*i.e.*, on a fiscal year basis commencing on each July 1 and ending on the following June 30). The calculation of actual bonus payments shall be based upon a graduated scale, using objective and subjective factors to determine bonuses, such as the joint collaborative efforts of the Employee with any other employees. In determining bonuses, the following ranges shall be used as nonbinding guidelines by the Company:

i. Adoptions equal to **$1 million** or more—approximate bonus **$37,500.**

ii. Adoptions equal to **$2.5 million** or more—approximate bonus **$75,000.**

iii. Adoptions equal to **$5 million** or more—approximate bonus **$150,000.**

(*Id.* at 2–3 (emphasis in original).)

An October 12, 1999 memo on incentive compensation ("Incentive Compensation Memo"), which provides additional detail on the Incentive Compensation Plan, explains that perfumers receive a bonus of some sort if their adoptions exceed $500,000, but receive no bonus if their adoptions fall below $500,000. (Clark Decl. in Opp'n., Ex 11 ("Incent.Comp.Mem.").) According to the Memo, the Plan provided a range of bonuses for perfumers based on estimated sales; based on adoption value, perfumers were to be awarded a percentage of his base salary in terms of months. If the employee's annual sales exceeded the forecasted amount, Firmenich could decrease future bonuses. (*Id.*) The Plan also makes clear that, while there are certain minimum bonuses to which perfumers are enti-

tled depending on their adoptions, division heads have the power to increase bonuses. (*Id.*)

The adoption value of Delville's fragrances ranged from $7 million to $14 million between fiscal years[4] 2001–2007. (Pl.'s 56.1 in Opp'n. at ¶¶ 193–199.) Delville departed Firmenich at the beginning of fiscal year 2008, but his fragrances nonetheless had an adoption value of over $5 million for that year. (*Id.* at ¶ 200; *see also* Dkt. No. 46 ("Vittoria Decl. in Opp'n.") at ¶ 18.)

According to Defendant, Firmenich's projections respecting the anticipated sales of Delville's products were inaccurate, as a consequence of which Delville was overpaid by $80,000 before his departure. (Murad Decl. at ¶ 22.)

The Incentive Compensation Plan provides that awards are to be paid "after the first order of the adopted product has shipped," and does not state that employees must be employed on the adoption date in order to receive a bonus under the Plan. (Incent. Comp. Mem.)

#### c. Confidentiality Agreements

The Employment Agreement contains the following provision concerning Delville's duty to preserve confidential and/or proprietary information:

> [Delville] shall regard and preserve as confidential: (i) all trade secrets and/or other proprietary and/or confidential information belonging to [Firmenich] ... (ii) all trade secrets and/or proprietary and/or confidential information belonging to a third party which have been confidentially disclosed to [Firmenich].... [Delville] shall not, without written authority from [Firmenich] to do so, use for [Delville's] own benefit or

4. The fiscal year ran from July 1 to June 30. In other words, fiscal year 2006 ran from July 2005 to June 2006. (Dkt. No. 42 ("Clark's Decl. in Opp'n"), Ex 2 ("Vittoria Dep.") at 173.)

purposes, or the benefit or purposes of any person or entity other than [Firmenich] . . ., nor disclose to others, either during the term of this Agreement or thereafter, except as required in the course of performance of services under this Agreement . . . any Confidential Information.

(Emply. Agrmt. at 7.) "Confidential information" is defined in the Employment Agreement as including, *inter alia*, "all nonpublic information relating to [Firmenich's]" "formulas," "business," and "research and development programs." (*Id.*)

On April 5, 2000, the parties executed the Secrecy Agreement. (Sec. Agrmt.) Although executed four days after the Employment Agreement, the Secrecy Agreement does not reference the Employment Agreement. (*Id.*) The Secrecy Agreement provides in relevant part:

> [Delville] agrees during [his] employment and subsequent thereto to treat as secret and confidential and not to disclose, directly or indirectly, or make use of any and all technical information, formulae, processes, customer lists, supplier lists, purchase or sales data, or any other information respecting research, development and discoveries disclosed to [Delville] or obtained by [him] during [his] employment.

(*Id.*) The Secrecy Agreement also prohibits Delville from allowing others to "publish or disclose during [his] employment or subsequent thereto, any secret or confidential knowledge with respect to any processes, research, development or discoveries, or any other matter relating to [Firmenich's] Business concerning which [Delville] may in any way acquire knowledge." (*Id.*) Finally, the Secrecy Agreement requires Delville to "keep accurate and complete laboratory and research notes," and states that "[a]ll such notes and note books therefor shall be and remain the property of [Firmenich] to be surrendered at [Firmenich's] demand." (*Id.*)

### 3. Alteration of Delville's Contract in 2007

In March 2007, Firmenich notified Delville that it did not intend to renew his contract another year. At a meeting between Delville and Vittoria, Vittoria urged Delville to give up his work as a full-time perfumer and work for Firmenich as a trainer four days a week. (Pl.'s 56.1 in Opp'n. at ¶¶ 277, 281.) Vittoria also informed Delville that he should expect Firmenich to offer him a reduced salary for the upcoming year. (*Id.*)

On April 1, 2007, Vittoria officially made its offer to Delville on behalf of Firmenich.[5] Firmenich proposed that Delville's prior Employment Agreement not be renewed, but that Firmenich be rehired at a 20 percent reduced salary and with 20 percent fewer hours (from 35 a week to 28 per week). (Clark Decl., Ex. 15 ("2007 Emply. Agrmt.").) The new agreement also provided for at-will employment. (*Id.*)

Vittoria knew, after his discussions with Delville in March and in April, that Delville was unhappy with the new agreement's proposed terms. (Pl.'s 56.1 in Opp'n. at ¶¶ 279; 288–89.) Indeed, Vittoria told Delville that if he was unhappy he should call a lawyer and find another job. (*Id.* at ¶ 287.) While Delville was indeed not pleased by the new agreement, he finally signed it on May 12, 2007. (*Id.* at ¶ 292.) He felt as if he had no choice but to sign the agreement, and felt that attempting to negotiate was futile. (*Id.* at

---

5. Firmenich actually made an offer on March 31, but then sent Delville a slightly revised offer the next day. (*Id.* at ¶ 285.)

¶ 291.) It was made "clear" to Delville that there was no possibility of his continuing on at his current annual wage. (*Id.* at ¶ 282.)

In June 2007, Delville began discussing with Symrise, A.G. ("Symrise") the possibility of Delville's leaving Firmenich for Symrise. On June 27, 2007, Symrise sent Delville an offer of employment, which would pay Delville substantially more than would Firmenich under Firmenich's new offer. On July 2, 2007, Delville submitted a letter of resignation to Firmenich. The following day, Delville began working at Syrmise. (Pl.'s 56.1 in Opp'n. at ¶ 352.)

### 4. The June 27, 2007 Letter and the Missing Formulas

On June 27, 2007, Delville sent a letter to Vittoria and other Firmenich executives indicating his discontentment with the Company and his intention to leave. (Murad Decl., Ex. B ("the June 27, 2007 Letter").) In the June 27, 2007 Letter, Delville states that, "despite the fact that I was expecting to retire with Firmenich, the past few months have been particularly intense for me at the company . . . ." (*Id.*) He then goes on to enumerate certain "points which hurt me psychologically very much," including that

A—I have been harassed, bullied, put under pressure to leave indirectly

B—I have been told that I was tired and that I should consequently relax and take my Friday's off taking of course a cut

C—The company is looking for younger people (age discrimination [sic])

D—If I am not happy I should call my lawyer and an other [sic] competitor . . .

G—the company do [sic] not let me participate to some [sic] key industry meetings and major briefs because we prefer to push younger perfumers. [T]hey are the future.

H—at my age some companies fire perfumers instead Firmenich phase [sic] them out . . .

L—For two years a special bonus allowed by Patrick Firmenich in my contract was not paid. I had to prove my case to get it transferred otherwise it would have disappeared among the numbers . . . .

(*Id.*)

Delville then spoke to Vittoria on June 29, 2007, and it was agreed that, if Delville decided to leave, he would submit his formal resignation the following week. (Pl.'s 56.1 at ¶ 97.) The parties dispute whether during this call Vittoria gave Delville permission to retrieve his personal items from the office over the weekend. (*Id.* at ¶ 98; Def.'s 56.1 in Opp'n. at ¶ 98.) In any event, according to Defendant, shortly before submitting his formal resignation on July 2, 2012, Delville destroyed and discarded perfume samples and removed paper files containing perfume formulas from his office. (Vittoria Decl. in Opp'n. at ¶¶ 4, 9); *see also id.* at ¶¶ 5–6 ("Scott Carol, the lab manager at the time, informed me after Plaintiff's resignation that there were hundreds of perfume sample bottles in a large drum in the HAZMAT room that had labels on them indicating they were Plaintiff's samples . . . many of the samples were broken and mixed together.") Plaintiff, meanwhile, claims he was sorting out good and bad samples, and cleaning his workspace. Plaintiff also claims that the formulas he later sent back to Firmenich after his departure "were materials that he had in his possession from having done work at home." (Pl.'s 56.1 at ¶ 126.)

On July 11, 2007, after he left the Company, Delville was contacted by Firmenich about the missing formulas. (*See* Vittoria Decl. in Opp'n., Ex. B.) Delville sent Firmenich formulas "in dribs and drabs," from July 2007 to October 2007. (Clark Decl., Ex. 2 ("Vittoria Dep.") at 109: 6–21.)

Delville claims that he has faxed all the formulas in his possession (Pl.'s 56.1 at ¶ 121), but to this day Firmenich is still missing some of Delville's formulas. (Vittoria Decl. in Opp'n. at ¶ 10.) As of October 1, 2010, Firmenich was missing 23 of Delville's experimental formulas. (Pl.'s 56.1 at ¶ 189; Def.'s 56.1 in Opp'n. at ¶ 189.) However, only eight of those formulas remain missing to date. (Pl.'s 56.1 at ¶ 193; Def.'s 56.1 in Opp'n. at ¶ 193.) Firmenich used gas chromotography to attempt to determine the content of Delville's formulas, but Firmenich was not successful in replicating all of the missing formulas. (Vittoria Decl. in Opp'n. at ¶ 11.) According to Vittoria, Firmenich spent $33,627.94 in personnel hours searching for, and recreating, Delville's work. (*Id.* at ¶ 14.)

### 5. Firmenich's Interactions with Symrise

On July 9, 2007, Vittoria called the then-President of Symrise and accused Delville of impermissibly "tak[ing] with him" to Symrise proprietary documents from Firmenich. (Clark Decl. Ex. 3 ("Atkinson Dep.") at 173:21–22.) On July 11, 2007, Firmenich sent a letter to Symrise's legal department, stating that Delville was obliged not to disclose any of Frimenich's confidential information or trade secrets. (Clark Decl., Ex 61 ("Firmenich Letter to Symrise") at 1.) Firmenich claims that such letters were standard. (Def.'s 56.1 at ¶ 92). Management at Symrise was upset with Delville regarding both the phone call and the letter. (Pl.'s 56.1 in Opp'n. at ¶¶ 380–383.)

### 6. Enter the Lawyers

On August 9, 2007, Anne Clark ("Clark"), a partner at the law firm Vladeck, Waldman, Elias & Engelhard, P.C., sent a letter to Firmenich on behalf of Delville, explaining that Delville believed he had been discriminated against by the Company on the basis of his age. (Clark Decl. in Opp'n., Ex 64.)

On March 14, 2008, Clark notified Firmenich's counsel, Thomas J. Barton, a partner at the law firm Drinker Biddle & Reath, LLP, that Delville had not received any CAP statements, and that "we view this as further retaliation against Mr. Delville." (Clark Decl. in Opp'n., Ex. 69.) On September 25, 2008, Clark sent an email to Firmenich's counsel Gregory B. Reilly ("Reilly"), a partner at the law firm Littler Mendelson P.C. (Clark Decl. in Opp'n., Ex. 70.) The email states that "Mr. Delville should have started receiving payments for the Employee Salary Deferred Contributions in his CAP II last summer," and asks Reilly to investigate why Delville had not yet been paid. On September 13, 2011, Clark wrote to Reilly, noting again that "plaintiff has not received a CAP statement from Firmenich reflecting his account balance since October 15, 2010 for the period ending September 30, 2010." (Clark Decl. in Opp'n., Ex. 71.) The letter asks that Reilly "send plaintiff quarterly CAP statements for the period from October 1, 2010 to present." (*Id.*) The letter also requests that Plaintiff begin receiving payments under the CAP II plan, as "Firmenich should have paid plaintiff his CAP II benefit beginning in the summer of 2007 in accordance with plaintiff's Distribution of Benefits form." (*Id.*)

On October 14, 2011, Reilly sent Clark a check for $91,908.69, "reflecting payment from the CAP II plan to your client, Jean Claude Delville." (Clark Decl. in Opp'n., Ex. 72.)

### B. Procedural Background [6]

Delville filed a charge of discrimination with the Equal Employment Opportunity

---

6. Initially, the case was before the Honorable Thomas P. Griesa, United States District Judge; it was later reassigned to my docket. (Dkt. No. 17.)

Commission on December 7, 2007. (Clark Decl. in Opp'n. Ex 10.) Plaintiff filed his initial complaint on December 15, 2008. (Dkt. No. 1.) He then amended his complaint on March 2, 2009. (Dkt. No. 7 ("Amend.Compl.").) Defendant answered the Amended Complaint and counterclaimed on March 18, 2009. (Dkt. No. 8 ("Ans. & Counterclm.").) Plaintiff answered Defendant's Counterclaim on March 18, 2009. (Dkt. No. 10 ("Pl.'s Ans.").) After a lengthy and contentious period of discovery, the parties cross-moved for summary judgment on March 2, 2012. (Dkt. No. 26 ("Pl.'s Mem.") and Dkt. No. 32 ("Def.'s Mem.").) The parties opposed each other's motions on April 2, 2012. (Dkt. No. 40 ("Pl.'s Opp'n.") and Dkt. No. 50 ("Def.'s Opp'n.").) Both parties replied on April 23, 2012. (Dkt. No. 52 ("Pl.'s Rep.") and Dkt. No. 54 ("Def.'s Rep.").)

## II. Summary Judgment Standard

"Pursuant to Federal Rule of Civil Procedure 56, summary judgment 'is appropriate when the evidence shows that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.'" *Borghese Trademarks Inc. v. Borghese*, No. 10 Civ. 5552(JPO)(AJP), 2013 WL 143807, at *6 (S.D.N.Y. Jan. 14, 2013) (citation omitted). The non-moving party must respond to the adverse party's pleading with "specific facts showing that there is a genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). An issue of fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The initial burden of a movant is to provide evidence on each material element of his claim or defense illustrating his entitlement to relief. *Vt. Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir.2004). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). A motion for summary judgment prevails "[o]nly when no reasonable trier of fact could find in favor of the nonmoving party." *White v. ABCO Engineering Corp.*, 221 F.3d 293, 300 (2d Cir.2000) (citing *Taggart v. Time, Inc.* 924 F.2d 43, 46 (2d Cir.1991)); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party must advance more than mere "conclusory statements, conjecture, or speculation" to successfully defeat a motion for summary judgment. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996) (citing *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348); *see also Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations omitted)).

## III. Defendant's Motion for Summary Judgment

Defendant has moved for summary judgment, contending that Plaintiff's discrimination (Claims One, Two, and Three), retaliation (Claims Four, Five, and Six), and breach of contract (Claim Seven) claims should all be dismissed.

## A. Discrimination Claims (Claims One, Two, and Three)

█ Plaintiff alleges that he has been subjected to age discrimination, in violation of the ADEA, the NYSHRL, and the NYCHRL.[7] The ADEA prohibits employers from discriminating in hiring, discharge, or the setting of "compensation, terms, conditions, or privileges of employment" based on the age of an employee. 29 U.S.C. § 623(a)(1). The ADEA covers the class of individuals who are over the age of 40. § 631(a).

█ At the outset, it is worth noting that "summary judgment must be granted only with caution in employment discrimination cases, especially those that turn on the employer's intent." *Harding v. Wachovia Capital Markets, LLC,* No. 10 Civ. 3496(JPO), 2012 WL 4471543, at *6 (S.D.N.Y. Sept. 21, 2012) (citations omitted). Moreover, "[d]irect evidence of an employer's discriminatory intent is often hard to obtain, and plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence." *Id.* (citations omitted). It is nonetheless true that plaintiffs alleging ADEA violations now carry a slightly weightier burden than those alleging Title VII violations. *See generally Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009); *Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 106 (2d Cir. 2010). The Second Circuit applies a three-part burden-shifting approach to resolving ADEA cases: At the outset, the plaintiff must demonstrate *prima facie* evidence of discrimination, at which point the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for its conduct. *Gorzynski,* 596 F.3d at 105–06. If the defendant meets its burden, it is then up to the plaintiff to show "by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross,* 557 U.S. at 180, 129 S.Ct. 2343.[8] Needless to

---

7. For the most part, "age-discrimination claims under the ADEA, NYSHRL, and NYCHRL are analyzed under the same standard." *Tomassi v. Insignia Fin. Grp., Inc.,* 478 F.3d 111, 113 n. 3 (2d Cir.2007) (citation omitted). Thus, unless otherwise indicated, this analysis applies to Plaintiff's federal, state, and local claims.

8. This approach, of course, is based on the burden-shifting framework first articulated by the Supreme Court in the Title VII decision of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). That framework was applied in parallel fashion under Title VII and the ADEA until 2009. *See, e.g., Tomassi,* 478 F.3d at 114 (employing *McDonnell Douglas* burden shifting in an ADEA case). However, in *Gross,* the Supreme Court held that, regardless of whether the *McDonnell Douglas* test applies in ADEA cases (a question left open by the Court), the ADEA ultimately requires proof that age was the "but-for" case of the challenged employment action. *Gross,* 557 U.S. at 177–78, 129 S.Ct. 2343. Thus, while the Second Circuit has clarified that the *McDonnell Douglas* burden-shifting framework continues to apply in ADEA cases, *Gorzynski,* 596 F.3d at 106, the final step of that analysis now differs between Title VII and the ADEA: while the final step under Title VII requires pretext sufficient to show that unlawful discrimination was a "motivating factor" in the employment action, the final step under the ADEA requires pretext sufficient to show that age-based discrimination was the "but-for cause" of the action.

Under the NYCHRL, however, the plaintiff's final burden more closely resembles *McDonnell Douglas* than *Gross. See, e.g, Colon v. Trump Int'l Hotel & Tower,* No. 10 Civ. 4794(JGK), 2011 WL 6092299, at *5 (S.D.N.Y. Dec. 7, 2011) (holding that "the NYCHRL is still subject to the 'motivating factor' standard" (citing *Weiss v. JPMorgan Chase & Co.,* No. 06 Civ. 4402(DLC), 2010 WL 114248, at *3–4 (S.D.N.Y. Jan. 13, 2010)); *see also Bennett v. Health Mgmt. Sys., Inc.,* 92 A.D.3d 29, 936 N.Y.S.2d 112, 124 (1st Dep't 2011) ("If the plaintiff responds with some evidence that at least one of the reasons proffered by defendant is false, misleading, or incomplete ... such evidence of pretext should in almost every case indicate to the

say, Plaintiff's job at this stage is not to convince this Court that it prevails under the *Gross* framework, but rather to show that a genuine issue of material fact exists as to whether it can ultimately do so at trial. *Gorzynski*, 596 F.3d at 106–08.

### 1. *Prima Facie* Case

Plaintiff's burden of establishing a *prima facie* case is "not a heavy one." *Id.* at 107 (citing *Carlton v. Mystic Transp.*, 202 F.3d 129, 134 (2d Cir.2000)); *see also Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir.2009) (noting that the *prima facie* burden, in the Title VII context, is *"de minimis"* (citation omitted)). Rather, Plaintiff need only show that (1) he "was within the protected age group," (2) he "was qualified for the position," (3) he "experienced adverse employment action," and (4) "that such action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski*, 596 F.3d at 107 (citing *Carlton*, 202 F.3d at 134). The Court's "task . . . is to examine the entire record and . . . make the case-specific assessment as to whether a finding of discrimination may reasonably be made." *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 382 (2d Cir.2001).

Defendant has alleged that Plaintiff cannot meet his burden as to the last two elements of this test. Each is examined in turn.

### a. The Alleged Adverse Employment Action

At the outset, Defendant contends that Plaintiff did not experience an adverse employment action. This Court disagrees.

In this Circuit, "a plaintiff may suffer an 'adverse employment action' if she endures a 'materially adverse change in the terms and conditions of employment.'" *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 446 (2d Cir. 1999) (quoting *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir.1997)), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

■ Delville has proffered evidence that Firmenich decided not to renew Delville's contract in 2007, and that Firmenich then offered him a job with reduced hours, reduced pay and benefits, and weakened employment protection. Of course, Plaintiff chose to take the lower-paying job, but that does not necessarily make Firmenich's decision not to renew Plaintiff's contract any less adverse. Indeed, viewing the evidence viewed in the light most favorable to Plaintiff, Defendant made clear to Plaintiff that there was simply no chance of Delville continuing on with the same job and same pay.[9]

court that a motion for summary judgment must be denied.")).

In any event, given the conclusion reached *infra* that Plaintiff's federal age discrimination survives summary judgment, any differences among federal, state, and local age discrimination laws are irrelevant to the outcome of these motions.

9. Plaintiff also claims that he was constructively discharged. "To find that an employee's resignation amounted to a constructive discharge, the trier of fact must be satisfied that the . . . working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62,

73 (2d Cir.2000) (citation and internal quotation marks omitted); *see also Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993) (constructive discharge "occurs when an employer 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation'" (quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir.1983))). It is not necessary to reach the question whether Plaintiff was constructively discharged, as Delville is able to demonstrate that other adverse employment actions took place. However, to the extent that constructive discharge is a necessary element of Plaintiff's theory of liability, the evidence of mistreatment of Plaintiff based on his age, along with Defen-

#### b. Evidence of Discrimination

■ The Court next considers whether a finder of fact could reasonably determine that Plaintiff has proffered evidence of circumstances supporting an inference of discrimination—the fourth element of the prima facie case. In support of this element, Plaintiff has presented evidence purportedly demonstrating that (i) he was treated differently than younger perfumers, (ii) Firmenich had a policy of favoring younger perfumers, and (iii) comments were made to Deville and his wife indicating the Company's preoccupation with his age.

#### i. Opportunities Provided to Younger Perfumers

■ "[T]he fact that other younger employees" are treated differently than a plaintiff alleging age discrimination "is both *prima facie* evidence of discrimination" and "evidence that the reasons given [for the defendant's adverse actions] were pretextual." *Gorzynski*, 596 F.3d at 108. Plaintiff has proffered evidence indicating that he was not provided opportunities made available to younger perfumers. For instance, Delville testified that Blanc and Voelkl, younger perfumers (they were in their late thirties and early forties during the incidents in question) hired after Delville, had better access to customers, internal information, and important meetings than he did. (Pl.'s 56.1 in Opp'n at ¶¶ 240–251.) [10] Moreover, Delville testified in his deposition that Firmenich's management often referred to Blanc and Voekl as "blossoming" and "blooming talent." (Delville Dep. at 79:8–80:17.)

#### ii. Evidence of Firmenich's Preoccupation with Age

■ Evidence that a company has a policy of favoring younger employees can also constitute part of a plaintiff's *prima facie* case. *See, e.g., Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 163 (2d Cir.1998) (statement by officer that defendant sought "younger blood" was evidence of age discrimination). Internal Firmenich documents suggest that the Company was preoccupied with the ages of its perfumers and had a strong desire to increase the percentage of young perfumers in its employ. (*See, e.g.,* Clark Decl. in Opp'n., Exs. 27, 29.) For example, a PowerPoint drafted by the Global Head of Perfumers betrays Firmenich's concern about its "[a]ging top performers" and intimates that Company's commitment to hiring perfumers under forty. (*Id.*, Ex 27 at F3003165.) Other documents indicate that Firmenich was tracking the anticipated retirement years of its elderly perfumers (Clark Decl., Ex. 29; Vittoria Dep. at 212:12–21), and that the Company was particularly interested in hiring new perfumer trainees in their twenties. (Clark Decl., Ex. 33 at F003177.) These examples of Defendant's preoccupation with the age of its employees could support an inference by the finder of fact that Delville's contract was not renewed on the basis of his age.

dant's decision to substantially reduce his hours and pay, constitutes sufficient evidence to allow the theory of constructive discharge to survive Defendant's Motion.

10. Plaintiff contends, for example, that these younger perfumers were treated differently when it came to meeting with Dr. Clotaire Rapaille. Defendant asserts that this is a nonsensical argument, since "no one at Firmenich denied [Delville] access to Dr. Rapaille's research, and he attended some meetings with Dr. Rapaille, but found him 'too complex to understand.' " (Def.'s 56.1 at ¶ 79 (citations omitted)). However, Plaintiff's complaint is not that he was not given access to Dr. Rapaille's research, but that younger perfumers were invited to attend working and debriefing sessions with Dr. Rapaille, while Firmenich was not. (Delville Dep. at 73:11–77:4; *see also* Clark Decl. in Opp'n., Ex. 7 ("Zendejas Dep.") at 64:12–14.)

### iii. Statements to Delville Evidencing Bias

Statements made to or about a plaintiff can constitute powerful evidence of bias. *See, e.g., Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151–53, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (comments to plaintiff that he was "so old [he] must have come over on the Mayflower" and that he was "too damn old to do [his] job" were an important part of plaintiff's *prima facie* case); *see also Levin v. Analysis & Tech., Inc.*, 960 F.2d 314, 317 (2d Cir.1992) (plaintiff's allegations that there were "specific derogatory references to his age made by his superiors" is *prima facie* evidence of discrimination). Plaintiff has also proffered evidence that his superiors at Firmenich made statements to and about him that provide additional evidence of age discrimination.

Delville's superiors repeatedly questioned Delville about when he planned to retire; according to Delville, this pressuring to retire occurred "all the time." (Pl.'s 56.1 in Opp'n. at ¶ 296; *see also id.* at ¶¶ 210–219.) It appears that this began in 2003, shortly before Delville's 55th birthday. (*Id.* at ¶ 210.) There is other evidence that Vittoria disfavored Delville because of his age. When he first met with Delville about Delville's pay and hours being reduced, Vittoria remarked that Delville seemed "tired" and urged Delville to take a "long vacation." (*Id.* at ¶ 277.)[11]

According to Delville, he complained orally to Armand de Villoutrey ("de Villoutrey"), Head of Fine Fragrance Worldwide, of age discrimination four or five times, starting in 2003. (*Id.* at ¶ 258.) During one such conversation, de Villoutrey opined that Delville should consider himself fortunate, because in other firms "people of a certain age" were simply "phase[d] out." (*Id.* at ¶ 298.)

The evidence suggests that Vittoria made discouraging comments to Delville's wife Zendejas, who is eighteen years Delville's junior, about Delville's age. (*Id.* at ¶¶ 252–255.) Indeed, Zendejas testified that Vittoria made disparaging comments to her about Delville's age on "many instances." (Zendejas Dep. at 108:15.) Zandejas also testified to Vittoria's rage after Delville filed his suit; after one meeting, Vittoria physically restrained Zandejas and demanded, "What does this old man"—i.e. her husband, Delville—"want?" (*Id.* at 107:6–15.)

Taken together, the evidence proffered by Delville is sufficient to support a *prima facie* case of discrimination based upon age.

### 2. Legitimate Non–Discriminatory Rationale

In response to Plaintiff's claim of discrimination, Defendant offers a legitimate nondiscriminatory rationale for his behavior. Firmenich claims that it sought to reduce Plaintiff's compensation because the success of Plaintiff's perfume adoptions were not sufficient to justify Delville's large salary. (Vittoria Dep. at 226:9–15; Dkt. No. 36 ("Vittoria Decl.") at ¶¶ 10–11; *see also* Def.'s 56.1 at ¶ 22 (alleging that "the revenue Plaintiff generated from [Delville's] perfume adoptions did not meet

11. Moreover, as Plaintiff rightly notes, even if the jury were to determine that the comments concerning Plaintiff's retirement were not meant to be hostile but rather were benign inquiries made out of a concern for Plaintiff's well-being, the jury could nonetheless find the comments discriminatory. *Cf. Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (Kennedy, J., concurring) (explaining that "[p]rejudice, we are beginning to understand, rises not from malice or hostile animus alone. It may result as well from insensitivity caused by simple want of careful, rational reflection or from some instinctive mechanism to guard against people who appear to be different in some respects from ourselves").

the Company's expectations" because "he made no blockbuster such as 'Happy' ".) Moreover, Firmenich notes there were "[o]ther Firmenich fine fragrance perfumers ... generating more revenue, but ... being paid considerably less than Plaintiff...." (*Id.* at ¶ 23.)

### 3. Pretext

"Once the employer has articulated non-discriminatory reasons for the challenged employment actions, the presumption of discrimination vanishes and the burden shifts back to the plaintiff to come forward with evidence that the employer's proffered explanations were merely pretextual and that the actual motivations more likely than not were discriminatory." *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 469 (2d Cir.2001) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Plaintiff can show that Defendant's non-discriminatory rationale is pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Ottaviani v. State Univ. of New York at New Paltz,* 679 F.Supp. 288, 298 (S.D.N.Y.1988) (quoting *Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Evidence of pretext includes, *inter alia,* "discriminatory statements or admissions, the mix of the workforce, an atmosphere of discrimination, the employer's general practices, comparative evidence, and statistics." *Id.* (citation omitted). The Second Circuit has "reject[ed] any categorical rule requiring age discrimination plaintiffs to offer, in addition to their *prima facie* case and evidence of pretext, further evidence that age discrimination was the actual motivation in

order to satisfy their burden." *Abdu–Brisson,* 239 F.3d at 469 (citation omitted).

■ Given the direct and circumstantial evidence of age discrimination proffered by Plaintiff, a reasonable finder of fact could determine that Firmenich's stated reason for reducing his hours and not renewing his contract was pretext for discrimination. *See Dominguez–Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 433 (1st Cir.2000) (explaining that "evidence of age-related comments could support an inference of pretext and discriminatory animus"); *see also Owens v. New York City Housing Authority,* 934 F.2d 405, 410 (2d Cir.1991) (evidence that employer made discriminatory comments is sufficient to overcome motion for summary judgment).

Moreover, evidence put forth by both Plaintiff and Defendant indicates that, while Delville did not create another blockbuster like "Happy" during his second stint at the company, Delville's work with Firmenich was quite successful. Indeed, Delville qualified for a substantial bonus every year he worked for Firmenich during his second stint.[12]

Thus, Delville's discrimination claims survive summary judgment.

### B. Retaliation (Claims Four, Five, and Six)

Firmenich also contends that Plaintiff's retaliation claim cannot survive summary judgment. Pursuant to 29 U.S.C. § 623(d):

It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any

---

**12.** There is other evidence of Delville's success at Firmenich. For instance, one Firmenich document indicates that, for Fiscal Year 2006, Delville exceeded his "Adoptions Objective" by 89%. (Clark Decl., Ex 30.)

member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

The Court must first determine whether Plaintiff can make out a *prima facie* case of retaliation. If so, the burden shifts to Defendant to provide a non-retaliatory basis for its behavior. Plaintiff then has the burden of showing that Defendant's rationale is a pretext. *Uy v. Mount Sinai Hosp.*, No. 10 Civ. 5674(LAP), 2012 WL 4560443, at *6 (S.D.N.Y. Sept. 30, 2012) (citations omitted). However, in the case at bar, Defendant has not put forward any non-retaliatory bases for the alleged conduct. Thus, the sole question is whether Plaintiff has successfully established a *prima facie* case for retaliation.

■ To establish a *prima facie* case of retaliation, Plaintiff must demonstrate that: (1) he engaged in a protected activity of which Defendant was aware; (2) Defendant took an adverse action against Plaintiff; and (3) there was a causal connection between the adverse action and the protected activity. *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67–70, 126 S.Ct. 2405 (2006).[13] Retaliation can be proven either

"indirectly by showing that the protected activity was followed closely by discriminatory treatment ... or directly through evidence of retaliatory animus." *DeCintio v. Westchester Cty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir.1987) (internal citations omitted).

### 1. Plaintiff's Protected Action

■ Protected activity "refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (citations omitted). "[T]his notion of 'opposition' includes activities such as 'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.'" *Id.* (quoting *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990)). In a footnote in its Memorandum of Law in Support of Defendant's Motion for Summary Judgment, Defendant suggests that "there is a real question whether Plaintiff's June 27, 2007 email constitutes 'sufficient activity' sufficient for a *prima facie* case of retaliation." (Def.'s Mem. at 18 n. 9.) This Court disagrees. The June 27, 2012 email explicitly complains that "[t]he company is looking for younger people (age discremination [sic])." (Murad Decl., Ex. B.) This comment is

13. Once again, the NYCHRL applies a slightly different standard:

A *prima facie* case of retaliation under the NYCHRL consists of a showing by the plaintiff that: (1) he participated in a protected activity known to the defendant; (2) the employer engaged in some responsive conduct; and (3) there exists a connection between the two actions, such that a jury could reasonably conclude from the evidence that [the complained-of] conduct [by the employer] was, in the words of the [NYCHRL], reasonably likely to deter a per-

son from engaging in protected activity, without taking account of whether the employer's conduct was sufficiently deterrent so as to be material.
*Williams v. Regus Mgmt. Grp., LLC*, 836 F.Supp.2d 159, 174 (S.D.N.Y.2011) (citation and internal quotation marks omitted); *see also Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 723 (2d Cir.2010) ("New York State courts and district courts in this Circuit have concluded ... that the retaliation inquiry under the CHRL is 'broader' than its federal counterpart." (citations omitted)).

enough to constitute an "opposition" to any discrimination.

The evidence proffered by Plaintiff also indicates that, about a month before, Delville had complained of age discrimination to de Villoutreys. (Pl.'s 56.1 at ¶ 295.) Delville has also testified that he orally complained to his superiors that he was being treated differently than younger employees several times between 2004 and 2007. (Pl.'s 56.1 at ¶¶ 258–260.) Finally, Delville's decision to pursue a legal claim against Firmenich, about which the Company had knowledge as of August 9, 2007, also constitutes a protected activity under the ADEA.

Thus, Plaintiff has demonstrated that he engaged in certain activities protected under the Federal, state, and local antidiscrimination laws.

### 2. Defendant's Adverse Action

Defendant contends that summary judgment should be granted because no materially adverse action was taken against Delville. However, Plaintiff has pointed to an array of Firmenich's actions that it alleges were retaliatory in nature.

▇▇▇▇▇ In order to constitute a materially adverse action, "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 57, 126 S.Ct. 2405. Construing the facts in the light most favorable to Plaintiff, Vittoria's accusations of theft against Delville to the then-President of Symrise, Joy Atkinson, as well as Firmenich's letter to Symrise shortly thereafter, constitute retaliation. Al-

though the communications between Firmenich and Symrise took place after Delville had left Firmenich, any attempt by a former employer to retaliate against a former employee by thwarting other employment opportunities constitutes impermissible adverse behavior. *See Pantchenko v. C.B. Dolge Co., Inc.*, 581 F.2d 1052, 1055 (2d Cir.1978) (employer prohibited from refusing to give references to retaliate against plaintiff); *EEOC v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085, 1089 (5th Cir.1987) (discontinuance of severance benefits after EEOC charge filed constitutes retaliation) (citations omitted); *Sherman v. Burke Contracting, Inc.*, 891 F.2d 1527, 1529, 1531–32 (11th Cir. 1990) (former employer unlawfully retaliated by persuading subsequent employer to terminate former employee who had filed EEOC charge).

First, Vittoria's telephone call to Atkinson was an adverse action. Indeed, Atkinson admitted in her deposition that the call from Vittoria gave her a "basis to suspect" untoward behavior on the part of Delville. (Atkinson Dep. at 172:21–173:22; *see also id.* at 175:23–21 (wherein Atkinson explains that her superior, Mr. Stanzi, was "not happy" with Delville when Atkinson informed Stanzi of Vittoria's accusations).) [14] Then there is the matter of Firmenich's letter to Symrise, sent shortly after Vittoria's phone call. Firmenich contends that its letter to Symrise was standard—and indeed, some of the language in the letter seems to support that contention.[15] However, given that, shortly before the Company sent this letter, Vittoria had called Atkinson to complain about Delville's conduct, a reasonable finder of fact

---

14. Similarly, Delville testified that, after Firmenich sent the letter to Symrise, Delville's boss came to see him and express that he was "very disappointed" by the letter. (Clark Decl., Ex. 1 (Delville Dep. 124:13–125:13).)

15. The letter explains that it is the "policy [of Firmenich] to notify [subsequent employers] of our former employee's continuing obligations to Firmenich Incorporated subsequent to resignation." (Firmenich Letter to Syrmise at 1.)

may well find that the letter contains language that, rather than *pro forma*, insinuates misbehavior on the part of Delville. For example, the letter states:

> We also wish to point out to you that the work product generated by Mr. Delville during the course of employment at Firmenich, and all other papers (or copies thereof) in the files other than purely personal papers in the nature of personnel correspondence, is the property of Firmenich and may not be removed or copied by him except with prior written consent.

(Firmenich Letter to Syrmise at 1.) This somewhat cryptic statement is—arguably, at least—aimed at suggesting to Syrmise that it has a thief in its midst. Thus, a genuine dispute of material fact exists as to whether this was indeed retaliatory behavior.

Plaintiff next claims that Firmenich retaliated against him by refusing to pay him what he was owed under the Incentive Compensation Plan and improperly handing his CAP accounts. It perhaps goes without saying that, where a company employs "economic retaliation" against its employees, an adverse action has taken place. *Burlington Northern and Santa Fe Ry. Co.*, 548 U.S. at 72–73, 126 S.Ct. 2405 (citation omitted); *Thompson v. City of New York*, No. 03 Civ. 4182(JSR)(JCF), 2006 WL 2457694, at *8 (S.D.N.Y. Aug. 10, 2006) ("Here, if the City did not have a legitimate basis for resisting Ms. Thompson's workers' compensation claim, but instead was opposing it for retaliatory reasons, the ultimate reversal of the denial does not cure the violation. The fear of loss of her benefits could well have induced Ms. Thompson not to file her workers' compensation claim."). There is evidence that, after Delville left the Company, Firmenich withheld Delville's quarterly CAP account statements, failed to freeze Delville's CAP I account, and dragged its

feet in paying on the CAP II account. (Pl.'s 56.1 at ¶¶ 384–410.)

Plaintiff also argues that Defendant's Counterclaims were retaliatory. Under some circumstances, lawsuits in response to a former employee's protected behavior have been held to constitute retaliation. *See, e.g., Fei v. WestLB AG*, No. 07 Civ. 8785(HB) (FM), 2008 WL 594768, at *3 (S.D.N.Y. Mar. 5, 2008) ("Lawsuits in response to a former employee's attempt to vindicate his rights can constitute retaliation.") (citing *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir.2001)). This Court does not believe that Defendant's Counterclaims are all baseless, and thus it is unclear whether Defendant's suit can amount to retaliation as a matter of law. *Compare Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 157 (3rd Cir.1999) (finding, in the Title VII context, that a lawsuit can be retaliatory even if the Court does not find that it lacks a reasonable basis), *with Beltran v. Brentwood N. Healthcare Ctr., LLC*, 426 F.Supp.2d 827, 833–835 (N.D.Ill.2006) (employer's counterclaim cannot form basis of retaliation cause of action where counterclaim is not baseless). In any event, because this Court has found other evidence that is sufficient to support a *prima facie* case of retaliation, it is unnecessary to "rely on the lawsuit to find retaliatory conduct." *Durham Life Ins. Co.*, 166 F.3d at 157.

### 3. Causal Connection

The next question is whether a sufficient causal connection exists between Plaintiff's protected activity and the alleged retaliatory conduct. In the Second Circuit, a causal connection can be established "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through

evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir.2000) (citing *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir.1993)); *see also Gorzynski*, 596 F.3d at 110 ("[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." (quoting *Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir.2001))).

When assessing indirect causal evidence, the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman–Bakos*, 252 F.3d at 554. "This has allowed our Court to exercise its judgment about the permissible inferences that can be drawn ·from temporal proximity in the context of particular cases." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir.2009).

■ Here, Plaintiff points to evidence of adverse actions in close temporal proximity to protected activity. Thus, there is sufficient indirect evidence of a causal connection to survive summary judgment.

Plaintiff has also presented direct causal evidence. As the Plaintiff notes in his brief, this Court has found that evidence of an employer's anger at its employee for engaging in a protected activity may well constitute direct causal evidence. *See Suggs v. Port Auth. of N.Y. and N.J.*, No. 97 Civ. 4026(RPP), 1999 WL 269905, at *6 (S.D.N.Y. May 4, 1999). Evidence suggests that Delville's superiors were angry at him for complaining about age discrimi-

nation and for filing a formal complaint at the EEOC. As noted *supra*, after Delville complained of discrimination through his attorney, his wife was accosted by Vittoria, who demanded that she explain what the "old man" wanted from Firmenich. Moreover, de Villoutreys characterized Delville's June 27 email as an "attack on the company" and intimated that Delville was attempting to shake down Firmenich. (Pl.'s 56.1 in Opp'n. at 326.)

Thus, Plaintiff has sufficiently demonstrated a causal connection between his protected activity and Firmenich's adverse actions. Because a jury could reasonably determine that Delville has satisfied all the necessary elements of his retaliation claim, Defendant's motion is denied as to this claim.

## C. Breach of Contract Claim (Claim Seven)

Finally, Defendant contends that Plaintiff's breach of contract claim fails as a matter of law.[16] Specifically, Defendant argues both that Plaintiff's claim is preempted, and that, even if it is not preempted, Plaintiff will be unable to prove breach of contract at trial.

### 1. Preemption

■ Defendant's argument that ERISA preempts Plaintiff's state law breach of contract claim can be disposed of easily. ERISA preemption is an affirmative defense, and as such, is waived if not pleaded in a defendant's answer. *See Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir.2003) (holding that "ERISA preemption of state contract claims in a benefits-due action is an affirmative defense that is untimely, and therefore subject to waiver, if not pleaded in the defendant's answer" (citations omitted)). Defendant fails to plead any such affirmative defense

---

**16.** Plaintiff also moves for summary judgment on this claim. *See infra*.

in its Answer, and thus has waived its preemption defense. Nor would it be appropriate, given that Defendant's Answer was filed nearly three years before it first raised its preemption defense, for this Court to "entertain [previously unpled] affirmative defenses at the summary judgment stage." *Id.* (citations omitted).

### 2. Plaintiff's Ability to Prove Breach of Contract

■ Under New Jersey law,[17] the elements of a breach of contract are "a valid contract, defective performance by defendant, and resulting damages." *Livingston Realty, Inc. v. CVS Pharmacy, Inc.*, No. 10 Civ. 00303(SDW), 2011 WL 6756948, at *3 (D.N.J. Dec. 21, 2011) (quoting *Coyle v. Englander's*, 199 N.J.Super. 212, 488 A.2d 1083, 1088 (N.J.Super.Ct.App.Div.1985)). Defendant contends that Plaintiff's breach of contract claim fails as a matter of law because no breach of either the CAP plan or the Incentive Compensation Plan occurred.

■ With regard to the CAP plan, a genuine dispute of material fact exists as to whether Firmenich breached the Amended Employment Agreement by failing to pay Delville the increased amount agreed to therein. This factual dispute does not evaporate simply because Firmenich states that it has paid all monies it owes Delville under the CAP plan.

Concerning the Incentive Compensation Plan, Defendant claims that Delville received more, not less, than he was owed. (Murad Decl. at ¶ 22.) However, Plaintiff has put forth sufficient evidence to create a genuine issue of material fact as to whether he should have received bonuses for the adoptions of Delville's perfumes that took place after Delville left Firmenich's employ.

Therefore, Defendant's motion for summary judgment as to Plaintiff's breach of contract claim is denied.

### IV. Plaintiffs' Motion for Summary Judgment

In his Motion for Summary Judgment, Plaintiff seeks the dismissal of all five of Firmenich's remaining Counterclaims. He also moves for summary judgment as to his breach of contract claim against Firmenich.

### A. Defendant's Breach of the Secrecy Agreement Claim (Counterclaim 1)

Plaintiff argues that Defendant cannot prove that Delville breached the Secrecy Agreement, and that Firmenich's claim for breach of contract must therefore be dismissed. While the Employment Agreement has a New Jersey choice of law provision, *see supra*, the Secrecy Agreement contains no such provision. As the alleged "center of gravity" of the dispute is New York State, New York law applies. *See Forest Park Pictures v. Universal Television Network*, 683 F.3d 424, 433 (2d Cir.2012) (explaining that under New York law's "center of gravity" choice of law approach, "a court may consider a number of significant contacts, including the place of contracting, the place of performance, the physical location of property that is the subject matter of the contract, and the domiciles or places of business of the contracting parties").

■ To prevail in a contract claim under New York law, the plaintiff must prove "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff

---

**17.** The Agreement contained a New Jersey choice-of-law provision. (Pl.'s 56.1 at ¶ 9.)

caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC,* 631 F.3d 42, 52 (2d Cir.2011) (citations omitted). Plaintiff contends that Defendant's claim fails as a matter of law as to both elements (1) and (3): that is, that Defendant cannot prove either that the Secrecy Agreement is a contract, nor— even if it is a contract—that it was breached. Finally, Plaintiff argues that Defendant's claim also fails under element (4), because Defendant has not presented sufficient evidence of damages.

### 1. The Existence of a Contract

At the outset, Plaintiff contends that the Secrecy Agreement does not constitute a contract, despite the fact that it is written and signed by both parties. The thrust of Plaintiff's argument is that, because the Secrecy Agreement did not "mak[e] specific reference" to the Employment Agreement, the former is void as a matter of law.

As is explained elsewhere in this Opinion (*see* IV.F), however, the "entire agreement" clause in the Employment Agreement can be overridden under New Jersey law. In other words, because the Employment Agreement is interpreted under New Jersey law, the "making specific reference" clause carries little weight.

■■■ Moreover, even if this were not the case, it is not clear that the Secrecy Agreement is in fact controlled by the "entire agreement" clause in the Employment Agreement. The "entire agreement" clause states that "[t]he Agreement contains the entire agreement between the Employee and the Company *with respect to the transactions contemplated herein*" and that its terms cannot be *"altered or otherwise amended"* unless so done in a signed writing referencing the Employment Agreement. (Emply. Agrmt. at 9– 10, emphasis added.) The Employment Agreement's paragraph eight concerns

Delville's duty with respect to "regard[ing] and preserv[ing] confidential information," while paragraph nine states that Delville must "return all media," including "documents," to Firmenich at the Employment Agreement's. (*Id.* at 7–8.) Nothing in paragraph three of the Secrecy Agreement appears to "alter" or "amend" the duties laid out in the Employment Agreement; rather, the Secrecy Agreement enumerates additional, more specific duties by which Delville promised to be bound.

In short, the Secrecy Agreement is indeed a binding contract.

### 2. The Contract's Breach

■■■ Delville contends that Firmenich has proffered no facts proving that Delville breached the fourth and fifth paragraphs of the Secrecy Agreement (concerning his duty not to disclose confidential information). Firmenich does not dispute this, but contends that "the applicable provision in this case is paragraph 3 ...." (Def.'s Opp'n. at 14.) The third paragraph of the Secrecy Agreement provides that "[Delville] shall keep accurate and complete laboratory and research notes as prescribed by Employer. All such notes and note books therefor shall be and remain the property of the Employer to be surrendered to Employer on demand." (Clark Decl., Ex. 11.) Defendant has proffered some evidence that Delville removed and discarded files from his office prior to his resignation. (*See, e.g.,* Vittoria Dep. at 103:25–105:20; Clark Decl., Ex. 4 ("Carroll Dep.") at 80:13–83:10; *see also* Clark Decl., Ex. 34 (email in which Vittoria mentions Delville's discarding perfume samples and "related documentation on Saturday, June 30th").) Thus, there is an issue of material fact as to whether the Secrecy Agreement was breached.

### 3. Damages

■■■ Delville contends that Firmenich's breach of contract claim should be dis-

missed for lack of proof of damages.[18] To prove its damages, Defendant has submitted a spreadsheet tabulating the estimated costs of Defendant's effort to search for Delville's formulas and recreate his work. (Vittoria Decl. in Opp'n., Ex. A; *see also* Vittoria Decl. in Opp'n. at ¶ 14.) Plaintiff argues that this chart simply does not constitute sufficient evidence of damages. Plaintiff is correct that Defendant's evidence of damages is meager, but this Court concludes that Defendant has proffered enough evidence of damages to survive summary judgment.

Therefore, Defendant's breach of contract claim survives summary judgment.

### B. Defendant's Breach of the Duty of Loyalty Claim (Third Counterclaim)

"New York law with respect to disloyal or faithless performances of employment duties is grounded in the law of agency, and has developed for well over a century." *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir.2003). That is, the duty of loyalty means that agents are "prohibited from acting in any manner inconsistent with his agency or trust and [are] at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." *Id.* (citation omitted). Under New York law, however, duty of loyalty claims are "limited to cases where the employee, acting as the agent of the employer, diverts business opportunities to himself or others to the financial detriment of the employer, or accepts improper kickbacks." *Farricker v. Penson Dev., Inc.*, No. 07 Civ. 11191(DAB), 2010 WL 845983, at *10 (S.D.N.Y. Mar. 4, 2010) (quoting *Veritas Capital Mgmt. LLC v. Campbell*, 22 Misc.3d 1107(A), at *10, 875 N.Y.S.2d 824 (N.Y.Sup.Ct.2008)); *see also Fada Int'l Corp. v. Cheung*, 57 A.D.3d 406, 870 N.Y.S.2d 23, 24 (1st Dep't 2008) (upholding the dismissal of plaintiff's duty of loyalty claim "since there is no claim that defendants used plaintiff's time, facilities or proprietary secrets in setting up their new business").[19] Defendant, however, has presented no evidence that Firmenich's confidential or proprietary information was

---

18. Relatedly, Plaintiff asks that this Court preclude any evidence of damages under Federal Rule of Civil Procedure 37(c)(1). In fact, in his request that this Court preclude all evidence of damages, Plaintiff attempts to eliminate Defendant's three remaining counterclaims that require proof of damages—the duty of loyalty claim, the breach of contract claim, and the unfair competition claim—in one fell swoop. (Pl.'s Mem. at 8–14.) Plaintiff may be correct that, given Defendant's inability to provide a description of its damages under Federal Rule 26(a)(1)(A)(iii), it would be within this Court's discretion to sanction Defendant by precluding all evidence of damages. However, "preclusion of evidence is a harsh remedy," and this Court does not believe that this is one of the "rare situations" in which such a sanction is warranted. *Ritchie Risk–Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 156–57 (S.D.N.Y.2012) (citations and internal quotation marks omitted).

19. Defendant argues that the duty of loyalty is broader than this, and that in fact "where an employee destroys an employer's valuable property," that in and of itself establishes disloyalty. (Def.'s Opp'n. at 17–18.) In support of this claim, Defendant directs this Court to *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F.Supp.2d 489 (S.D.N.Y.2011). But *Pure Power Boot Camp* does not stand for the proposition that destroying an employer's documents in and of itself rises to a breach of the duty of loyalty. Indeed, in *Pure Power Boot Camp*, there was evidence that the defendant not only destroyed documents, but also stole materials for the very purpose of competing against his employer. *Id.* at 522. Thus, at the very most, *Pure Power Boot Camp* indicates the proposition that the destruction of documents, when done for the purpose of competing against one's employer and in addition to other disloyal behavior, can constitute some evidence of a breach of loyalty.

used by Delville to benefit his subsequent employers. (Pl.'s 56.1 at ¶¶ 200–201; Def.'s 56.1 in Opp'n. at ¶¶ 200–201.) [20] Thus, Defendant's duty of loyalty claim fails as a matter of law.

### C. Defendant's Misappropriation Claim (Fifth Counterclaim)

 "A plaintiff claiming misappropriation of a trade secret must prove that: '(1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.'" *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 173 (2d Cir.1990) (quoting *Rapco Foam, Inc. v. Scientific Applications, Inc.,* 479 F.Supp. 1027, 1029 (S.D.N.Y.1979)). Misappropriation claims tend to require "fact specific inquir[ies]." *See, e.g., Fin. Techs. Int'l, Inc. v. Smith,* 247 F.Supp.2d 397, 410–11 (S.D.N.Y.2002).

 Defendant claims "there can be no doubt" of the merits of its misappropriation claim "where, as here, an employee destroys a barrel full of perfume samples and absconds with perfume formulas." (Def.'s Opp'n. at 21.) However, this Court has serious doubts—particularly as to Defendant's ability to prove the second element of misappropriation. Defendant admittedly proffered *no* evidence that, as a result of Delville's actions, Firmenich's confidential or proprietary information was used to solicit clients for, or otherwise benefit, Delville's subsequent employers. (Pl.'s 56.1 at ¶¶ 200–201; Def.'s 56.1 in Opp'n. at ¶¶ 200–201.)

Accordingly, Defendant's misappropriation claim fails as a matter of law.

### D. Defendant's Unfair Competition Claim (Fourth Counterclaim)

Unlike some of the narrower business tort state laws, "New York's law of unfair competition is a broad and flexible doctrine," which has been "broadly described as encompassing any form of commercial immorality, or simply as endeavoring to reap when one has not sown. . . ." *Telecom Intern. Am., Ltd. v. AT & T Corp.,* 280 F.3d 175, 197–98 (2d Cir.2001); *see also id.* ("Unfair competition is a form of unlawful business injury. . . . The incalculable variety of illegal commercial practices denominated as unfair competition is proportionate to the unlimited ingenuity that overreaching entrepreneurs and trade pirates put to use." (citation omitted)). However, "[w]hatever the breadth and flexibility of [an unfair competition claim], it depends upon the allegation of facts that, if true, would constitute misuse of plaintiffs' property." *Dow Jones & Co., Inc. v. Int'l Sec. Exch., Inc.,* 451 F.3d 295, 302 (2d Cir.2006); *see also All R's Consulting, Inc. v. Pilgrims Pride Corp.,* No. 06 Civ. 3601, 2008 WL 852013, at *13 (S.D.N.Y. Mar. 28, 2008) (explaining that, in an unfair competition claim, "the challenged practices must relate to competition in some form" (citation omitted)); *Louis Capital Markets, L.P. v. REFCO Grp. Ltd., LLC,* 9 Misc.3d 283, 801 N.Y.S.2d 490, 494 (N.Y.Sup.Ct.2005) ("Although New York courts have not explicitly defined what types of actions qualify as unfair competition, they have accepted the misappropriation of another's commercial advantage as a cornerstone of the tort of unfair competition." (citation omitted)).

---

**20.** More specifically, Defendant admits that "Firmenich has no evidence that Delville ever used any Firmenich confidential or proprietary information at Syrmise or for the benefit of any other fragrance house," and that "Firmenich has no evidence that Delville ever used Firmenich confidential or proprietary information to solicit clients for subsequent employers."

■ Defendant has not adduced evidence that Plaintiff has actually misused Firmenich's property in a competitive setting. Thus, Defendant's unfair competition claim suffers from the same infirmity as Defendant's other business tort claims, and cannot survive summary judgment.

### E. Defendant's Breach of Fiduciary Duty Counterclaim (Second Counterclaim) [21]

■ "To establish a claim for breach of fiduciary duty, in New York, a plaintiff must show (1) the existence of a fiduciary duty; and (2) breach of that duty." *Muller–Paisner v. TIAA*, 881 F.Supp.2d 579, 593 (S.D.N.Y.2012) (citation omitted). In New York, "all contracts imply a covenant of good faith and fair dealing in the course of performance. This covenant is breached when a party acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *Baguer v. Spanish Broadcasting Sys., Inc.*, 04 Civ. 8393, 2007 WL 2780390, at *8 (S.D.N.Y. Sept. 20, 2007) (citations and internal quotation marks omitted); *see also Gortat v. Capala Bros., Inc.*, 585 F.Supp.2d 372, 377 (E.D.N.Y.2008) ("While conduct that constitutes a breach of contractual obligations may also constitute a breach of a fiduciary duty arising out of that contract ... the gravamen of fiduciary duty is undivided and undiluted loyalty, barring self-dealing, use of confidential information, and other conflicts of interest." (internal quotation marks and citations omitted)).

To the extent that Defendant's claim is based upon Plaintiff's alleged misappropriation, this claim is dismissed as duplicative. *See Brooks v. Key Trust Co. Nat'l Ass'n.*, 26 A.D.3d 628, 809 N.Y.S.2d 270, 272–73 (3d Dep't 2006) (dismissing a breach of fiduciary claim as duplicative where the allegations upon which it was premised were "expressly raised in plaintiff's breach of contract claim or encompassed within the contractual relationship by the requirement implicit in all contracts of fair dealings and good faith"). To the extent that the claim is based upon Defendant's allegation that Plaintiff used Defendant's documents to enrich himself and his subsequent employers, this claim is dismissed for lack of evidence. *See supra.*

### F. Plaintiff's Breach of Contract Claim (Seventh Claim)

Plaintiff contends that he is entitled to judgment as a matter of law on his breach of contract claim.[22] Defendant disagrees, contending both that Plaintiff's claim is preempted by ERISA and that, even if it was not, Defendant has nonetheless complied with the Employment Agreement. As explained in Section I.C.1 of this Opinion, *supra*, Defendant's preemption affirmative defense has been waived, and this Court therefore does not consider it. Thus, the Court will focus on Plaintiff's

---

**21.** Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment does not oppose Plaintiff's Motion for Summary Judgment as to the Second Counterclaim. On December 3, 2012, Defendant's counsel, Gregory B. Reilly, sent a short letter to this Court "in clarification of Firmenich's position and in opposition to Plaintiff's motion respecting the fiduciary duty claim." (Dkt. No. 55.) The following day, Anne L. Clark, attorney for Plaintiff, replied to Defendant's letter. (Dkt. No. 56.)

**22.** The Seventh Claim, as pleaded in the Amended Complaint, alleged that "defendant has breached its contract with plaintiff concerning the CAP and the Incentive Compensation Plan." (Amend. Compl. at ¶ 73.) However, it appears from Plaintiff's brief (Pl.'s Mem. at 20–21) that he is only moving for summary judgment on the CAP portion of his breach of contract claim.

contention that the Agreement has been breached as a matter of law.

Under New Jersey law, the elements of a breach of contract are "a valid contract, defective performance by defendant, and resulting damages." *Livingston Realty, Inc. v. CVS Pharmacy, Inc.,* No. 10 Civ. 00303(SDW), 2011 WL 6756948, at *3 (D.N.J. Dec. 21, 2011) (quoting *Coyle v. Englander's,* 199 N.J.Super. 212, 488 A.2d 1083, 1088 (N.J.Super.Ct.App.Div.1985)).

■■ Delville contends that Firmenich breached the CAP provision in the Amended Agreement as a matter of law, by paying Delville $50,000 per year, rather than $60,000 per year, for 2005 and 2006. Firmenich, however, maintains that the Amended Agreement was altered by oral agreement, as memorialized in an October 3, 2006 email from Collins to Plaintiff. (Collins Decl. Ex. B.)

■■ At the center of this dispute is the Merger Clause, which states that the terms of Agreement "shall not be altered or otherwise amended except pursuant to an instrument in writing signed by each of the parties hereto and making specific reference to this agreement." However, under New Jersey law, even if a contract states that it can be amended only through a writing, "nonetheless the parties d[o] not thereby disable themselves from amending, supplementing or replacing the contract by a later agreement made orally or by conduct objectively manifesting a new understanding." *Lewis v. Travelers Ins.*

*Co.,* 51 N.J. 244, 239 A.2d 4, 9 (1968); *see also Goldstein v. Barclay Amusement Corp.,* 123 N.J.L. 166, 8 A.2d 171, 172 (1939) ("It is always within the province of the contracting parties to waive a provision such as this [that modifications be in writing], and to modify a written contract by parole, unless the agreement is of a character required to be in writing by a peremptory rule of law"); *SPJ, Inc. v. W2005/Fargo Hotels (Pool C) Realty, L.P.,* 2010 WL 4237371, at *9 (N.J.Super.A.D. Oct. 28, 2010) ("In certain circumstances, a court may conclude that the parties to a contract have modified its terms by a subsequent oral agreement, even if the contract purported to allow only written changes, and the parol evidence rule will not bar evidence of the oral agreement"); *McGrath v. Poppleton,* 550 F.Supp.2d 564, 571 (D.N.J.2008) (noting that "whether or not the parties intended that all modifications be in writing, at common law, a 'no oral modification' clause may be waived by the parties by entering into an otherwise enforceable oral agreement.") [23]

Therefore, the resolution of Plaintiff's breach of contract claim hinges upon the question whether an oral contract was indeed entered into by the parties reducing the CAP contributions back down to $50,000 per annum. Thus, Plaintiff is not entitled to summary judgment as to this claim.

**23.** By statute, New York no longer follows the common law rule followed in New Jersey. *See* General Obligations Law § 15–301(1) (providing that where a contract contains a "no oral modification" clause, that clause will be enforceable). Be that as it may, then New York Court of Appeals Judge Cardozo explained the rationale behind the common law rule:

> Those who make a contract may unmake it. The clause which forbids a change, may be changed like any other. The prohibition of

oral waiver, may itself be waived. Every such agreement is ended by the new one which contradicts it ... What is excluded by one act, is restored by another. You may put it out by the door; it is back through the window. Whenever two men contract, no limitation self-imposed can destroy their power to contract again.

*Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 122 N.E. 378, 381 (1919) (internal quotation marks and citations omitted).

## V. Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED in part and GRANTED in part, and Defendant's motion for summary judgment is DENIED. All of Plaintiff's Claims survive summary judgment, as does Defendant's First Counterclaim.

The Clerk of the Court is directed to terminate the motions at Docket Numbers 25 and 31.

SO ORDERED.